Filed 6/11/24  P. v. Duvall CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C098576 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF21-0004595) |
| v. | |
| RICHARD LEE DUVALL II, | |
| Defendant and Appellant. | |

In the hallway of a house in rural Shasta County, a standoff arose between defendant Richard Lee Duvall II and N.W.[1]  The two had words and defendant eventually told N.W. that he had 30 seconds to leave the house.  Defendant began to count aloud. When he reached 30, defendant stabbed N.W. in the neck, chest, and arm.  N.W. bled to death on the hallway floor.

---

[1]     To protect their privacy, we refer to the victim and witnesses by their initials. (Cal. Rules of Court, rule 8.90(b)(4), (10).)

1

A jury found defendant guilty of murder in the second degree, as well as a related enhancement. He was sentenced to an aggregate prison term of 30 years to life plus one year determinate.

On appeal, defendant asserts that the judgment must be reversed (1) due to instances of prosecutorial misconduct during cross-examination and closing arguments, and (2) because the trial court erred in refusing to instruct the jury with CALCRIM No. 626 on involuntary manslaughter based on unconsciousness caused by voluntary intoxication. We will affirm.

## BACKGROUND

An information charged defendant with a single count of murder. (Pen. Code, § 187, subd (a); count 1.)[2] The information further alleged that, in committing the murder, defendant used a deadly and dangerous weapon (§ 12022, subd. (b)(1)), and that he had sustained a prior strike conviction (§ 1170.12).

### The Trial—The Prosecution

L.N. lived in a house in Dana in Shasta County. L.N's niece, K.C., occasionally stayed at the house as well.[3] K.C. and defendant had a sexual relationship, but she was not his girlfriend.

On June 20, 2021, K.C. and defendant encountered N.W., whom they knew, in Burney, and they all went in N.W.'s car to Fall River Mills. Defendant got out of the car at the Fall River Lodge. N.W. agreed to take K.C. home while defendant remained at the lodge. K.C. and N.W. arrived at the house in Dana at 10:30 or 11:00 p.m., and they went to bed at 12:30 or 1:00 a.m.

---

**2** Undesignated statutory references are to the Penal Code.

**3** K.C.'s preliminary hearing testimony was read into the record because she was not available at trial.

Meanwhile, R.W. encountered defendant in Fall River Mills, and defendant asked him for a ride to K.C.'s house to retrieve his backpack, which contained drugs and his cellphone. Eventually, R.W. drove defendant to K.C.'s house, arriving between 2:00 and 3:00 a.m. During the drive, defendant told R.W. that he loved K.C. and that he hoped to help her get her children back.

Once at the house, defendant asked L.N. if K.C. and N.W. were in the bedroom and L.N. indicated they were. R.W. and defendant went into K.C.'s bedroom, saw K.C. and N.W. together, and K.C. told them to "[g]et the hell out." They returned to the living room where L.N., R.W., and defendant drank and smoked methamphetamine and marijuana.

K.C. woke up around 5:00 a.m. Defendant came into the bedroom and said he had lost his bag and his cellphone. He saw his cellphone and grabbed it. K.C. came out of the bedroom and told defendant and R.W. to "[g]et the fuck out of here" and pushed them out of the house.

Defendant and R.W. started to leave, but defendant decided he was not leaving without his backpack. He went back to K.C.'s bedroom. He appeared to be upset and matters between defendant and N.W. turned confrontational. N.W. walked towards defendant and they "h[ad] words." K.C. saw defendant was holding a knife. She stepped in front of N.W. trying to defuse the situation, but N.W. pushed her behind him.

Defendant told N.W. to leave and said he had 30 seconds. Defendant began a countdown. After he finished his countdown, K.C. saw defendant throw the arm he was holding the knife with at N.W. and then she saw "blood everywhere." Defendant was throwing his arm with the knife like he was hitting N.W., like he was throwing a punch. L.N. also saw defendant flailing his arms and fist. According to K.C., defendant was the first to attack; before defendant's first strike, N.W. did not put his hands on defendant at all. K.C. yelled for defendant to stop. Defendant paused, looked at K.C., and then continued fighting with N.W. It "ended by the front door," where N.W. collapsed,

3

holding his hands to his neck. He tried to speak, but could not. "It just sounded like he was choking on something."

Afterward, according to L.N., defendant "acted like he didn't know where he was at because he was all high and we pointed him toward the back door and he took off." Later, defendant came back to the house at least twice asking for directions because he did not know the area.

At approximately 4:00 p.m., a motorist picked up defendant and dropped him off in Fall River Mills. Defendant told the motorist that his girlfriend lived nearby and that when his girlfriend runs out of alcohol, "she starts calling other men." At 5:08 p.m., defendant called 911 from the Fall River Lodge and provided the address of the house in Dana.

Law enforcement arrived at the house in Dana after 5:30 p.m., where they found N.W. on the floor, deceased, and "a lot of blood." N.W. sustained stab wounds to the left upper neck below the earlobe, near the clavicle, to his left chest below the armpit, and in two locations on his left arm. The stab wound to N.W.'s upper neck cut the carotid artery and the jugular vein and penetrated his spine. A person with this wound could be expected to survive, untreated, for a matter of minutes. The wound near the clavicle also struck a major artery, entered the chest cavity, and punctured his lung. This wound, too, would have been fatal. N.W. died from massive blood loss as a result of two stab wounds to his neck. He did not have any injuries to his hands.

Law enforcement located a folding knife with a Raiders emblem on it in some bushes behind a gas station in Fall River Mills. There was dried blood on the knife. The parties stipulated DNA testing provided "very strong support" for the finding that the DNA mixture found on the knife contained N.W.'s blood. In fact, one was "one point two sextillion times more likely to obtain this mixture of DNA if [N.W.] is a contributor than if he is not a contributor."

4

During law enforcement's search for defendant, an officer obtained defendant's Facebook records. In a June 23, 2021, Facebook conversation between defendant and another user, defendant stated, "I'm going to prison." He elaborated, "[s]omeone's dead and it's my fault," and later, "there's two witnesses." Later, defendant stated, "I'm probably doing life . . . but you can write me." When the other user asked whom defendant killed and how it was his fault, defendant responded, "[h]e got stabbed in the neck and bled to death." When the other user asked again how it was his fault, he responded, "I'm the one who stabbed him . . . ." Defendant later added, "[d]idn't want to. He was in my face. I found him randomly and he took my shit before and left me in town. Found him sleeping with my phone and my bitch."

When law enforcement arrested defendant on June 24, 2021, he did not have any visible injuries on his head or hands, with the exception of small abrasions between his right thumb and forefinger and on his knuckles.

*The Trial—The Defense*

Defendant testified he knew K.C. and wanted to help her get her children back. They did have a sexual relationship, but he did not love her and did not want to be in a relationship with her.

On June 20, 2021, at a gas station in Burney, K.C., and defendant met up with N.W., got into his car, and drove to Fall River Mills. Defendant went to the Fall River Lodge to buy drugs. While he was there, he realized N.W. and K.C. were driving away, leaving him. Defendant's wallet, cellphone, and backpack were in N.W.'s car. Defendant managed to get a ride to K.C.'s house. On the way, he and his companion made several stops during which they used methamphetamine. Defendant had been "drinking like every day for at least a week . . . and . . . was smoking meth for awhile longer than that."

At the house, defendant asked L.N. if K.C. and N.W. were there, and L.N. pointed to the bedroom. Defendant knocked on the bedroom door and opened it, saw K.C. and N.W. were sleeping, and closed the door. Defendant testified that seeing them together

5

did not upset him and that he had "seen her with people before." He returned to the living room and hung out with L.N., talking and using methamphetamine.

When defendant went to K.C.'s bedroom a second time, K.C. told him to get out. Defendant saw his cellphone in the bedroom, so he grabbed it and returned to the living room. He resumed using methamphetamine.

Defendant's companion told him he had to go. Defendant did not want to leave without his backpack. He returned to the bedroom and told K.C. and N.W. he needed help finding his backpack. They both got up and walked toward the living room and defendant followed. However, when they reached the doorway, N.W. turned around and blocked defendant's way. Defendant was scared. He felt like he was being set up, like someone had purposefully taken his property and left him in Fall River Mills. Defendant felt like he might be jumped, and he knew N.W. was a fighter.

Defendant pulled out his knife, which had a Raiders emblem on it. He told N.W. he was going to count to 30 and then he was "going to rush him." His goal was merely to leave. Defendant started counting.

After defendant counted to 30, N.W. punched him in the head. Defendant "blacked out." He continued: "I don't remember anything. Everything happened quick and . . . all I remember is just [K.C.] screaming at me and I lifted my head up and opened my eyes and he was bleeding . . . ." Asked if he stabbed N.W., defendant testified, "I assumed that I did. Nobody else had the knife and he was bleeding." He testified he was sure he put the knife in N.W.'s neck. However, he also testified he did not recall stabbing N.W., and that he thought he had stabbed N.W. only once. Defendant remembered seeing blood squirting. Asked if he described to law enforcement blood coming out nonstop following his first strike, defendant testified, "That's what I remember. That's correct." N.W. backed towards the front door holding his neck.

Defendant left the house and tried to call 911, but his cellphone did not have service. After getting lost and returning to the house for directions at least twice, he

6

eventually found his way to a road. A motorist picked him up and drove him to Fall River Mills. Defendant disposed of his knife near a pizza place because the weight of the knife was pulling down his shorts.

Defendant called 911 from the Fall River Lodge, reported he had accidentally killed someone, and gave the operator the address. Asked how stabbing N.W. was accidental, defendant testified he did not plan on stabbing him, and that he "just panicked. I put my head down and I think I just reacted" while holding a knife. Defendant testified: "When he punched me my mind went black because . . . when he swung at me I put my head down out of reaction and after I got hit . . . my memory just went black. I think it was the adrenaline." He testified that he felt like he was in danger when N.W. punched him. He felt he was being "set up" and that he might get "jumped," that people were trying to take his property, and that he thought "there were other people there."

Detective Jeremy Ashbee testified that, during his interview, defendant said he had blacked out, but later said he had not. At some point defendant said he had been defending himself, and at other times he said the stabbing was accidental. Defendant never said anything about being afraid of being jumped or robbed. Nor did he say he believed anyone other than L.N. and K.C. were in the house. Defendant told Ashbee he did not mind fighting people, and actually kind of liked it. He told Ashbee "the first swing of his arm he struck [N.W.] with the knife," but he also said he did not know where it struck him first. Defendant stated, "blood immediately started coming up." Ashbee testified defendant did not appear to be intoxicated during the interview and Ashbee did not smell alcohol on him. Defendant acknowledged he had not used drugs or alcohol on the day of his arrest. On the drive to jail, defendant asked Ashbee to play a particular song because it reminded him of K.C.

7

*Verdict and Sentencing*

The jury found defendant not guilty of murder in the first degree but guilty of murder in the second degree, and found true the enhancing allegation that, in committing the murder, defendant used a deadly weapon.

Defendant admitted the prior strike allegation, and the trial court denied his motion to strike the prior strike conviction. The court sentenced defendant to an indeterminate term of 15 years to life in prison for the murder, doubled to 30 years to life based on his prior strike, plus one year for the use of a deadly weapon enhancement.

## DISCUSSION

### I

*Prosecutorial Misconduct*

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

Defendant asserts the prosecutor committed misconduct while cross-examining him and in her closing arguments. He contends the prosecutor repeatedly inserted her personal opinion and animus into the proceedings and appealed to the jury's biases and sympathies. The People respond that defendant's claims are forfeited, they fail on the merits, and any misconduct was not prejudicial.

To preserve a claim of prosecutorial misconduct, a "defendant must generally object 'in a timely fashion—and on the same ground,' and must 'request[ ] that the jury be admonished to disregard the impropriety.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29.) As we discussed *post*, defendant has forfeited each of his claims of prosecutorial misconduct by failing to object immediately and to request an admonition.

8

During her cross-examination of defendant, the prosecutor asked him about the fact that he never said in his law enforcement interview that he was afraid and that he feared being robbed, and defendant responded that law enforcement never asked him. When the prosecutor sought clarification, defendant testified, "I don't remember if I was or not honestly." The prosecutor retorted, "Honestly isn't the best word for you to be using." Defendant neither objected nor requested an admonishment.

When the prosecutor read part of defendant's statement to law enforcement, suggesting it indicated that he remembered what happened, defendant testified: "I know that I blacked out. I don't–there's no reason for me to lie about that. I know that when I did come into jail, I know that there's certain things on those papers." The prosecutor stated, "Hold on. There's no question pending." Again, defendant neither raised an objection nor requested an admonishment.

Discussing defendant's statements to law enforcement about discarding his knife, defendant referred to the fact that the weight of the knife was causing his shorts to sag. The prosecutor noted defendant had told law enforcement he felt uncomfortable with the knife because it "just killed somebody." Defendant acknowledged this was likely true. The prosecutor then said, "And you were getting rid of evidence." Defendant began, "That's–" and the prosecutor interjected, "How was placement of that knife in the bushes behind a building anything other than you trying to hide it?" Defendant responded, "It was dragging down my pants." Defendant neither objected nor requested an admonishment.

Later in the cross-examination, discussing N.W. being on the floor because defendant stabbed him, the prosecutor stated: "Because you stabbed him and then you left him there. He laid there for twelve hours in his own blood. What did you do besides eat pizza? How angry were you that he deserved that? Did he disrespect you by sleeping with your bitch?" Before defendant responded, the prosecutor asked, "Are you crying?" The exchange continued:

9

"[Defendant]: I'm not trying to.

"[Prosecutor]: For yourself or for [N.W.]? For yourself, right?

"[Defendant]: I didn't–I didn't mean for–

"[Prosecutor]: How do you not mean to put a knife in someone's throat after counting to thirty and disrespect him further and come in here and make up nonsense?" Defendant's counsel objected on the ground that there were "multiple pending questions," and the trial court sustained the objection. He did not object based on prosecutorial misconduct. Nor did he request any admonishment.

When the prosecutor asked defendant about his statement that he liked to fight, defendant testified, "I don't like fighting. I don't mind sticking up for myself, but even that I used to have a hard time doing that." The prosecutor responded, "Apparently not anymore." Defense counsel objected, stating, "Testimonial. Not a question," and the trial court sustained the objection. Defendant did not object on the grounds of prosecutorial misconduct. And defendant did not request any admonition.

The prosecutor showed defendant a photograph of the inside of the house and pointed out the blood trail leading towards the front door. She then pointed out, "[H]ere's a way out through the kitchen, right," implying defendant could have left without confronting N.W., and defendant agreed. She asked, "Totally unobstructed, right?" and defendant again agreed. She later asked defendant if he "could have left this way," and defendant responded that he did. He testified, "I blacked out in the hallway and when I looked up it was–" and the prosecutor stated, "Blacked out. Blacked out. That's crazy talk. Come on." The trial court sustained defense counsel's unspecified objection. However, counsel did not expressly object based on misconduct, and he did not request any admonishment.

Continuing to discuss whether there was an unimpeded way defendant could have left the house, defendant and the prosecutor had the following exchange:

10

"[Defendant]: Yes, and I left the house. I didn't leave the house right away, but . . . I wasn't aware at the time between there and halfway to the door.

"[Prosecutor]: [L.N.] saw you follow him. [K.C.] saw you follow him. He had additional marks on him after the first one.

"[Defendant]: No.

"[Defense Counsel]: Objection. Not a question.

"[The Court]: Sustained.

[¶] . . . [¶]

"[Prosecutor]: You heard all of that testimony, correct?

"[Defendant] Yes.

"[Prosecutor]: And there was another way out of the house?

"[Defendant]: I left that way. By the time I looked up and halfway to the front door he was walking back to the door. I wasn't going with him. I stopped what I was doing.

"[Prosecutor]: The blood pattern would seem to suggest something different, wouldn't you agree?

"[Defendant]: I don't know, but I'm telling you what happened.

"[Prosecutor]: This version?

"[Defendant]: I guess. That's what I remember.

"[Prosecutor]: Today?

"[Defendant]: And I remember it very clearly.

"[Prosecutor]: I thought you blacked out?

"[Defendant]: I did black out and I came back. I didn't stay blacked out.

"[Prosecutor]: That's good. That's good."

At no time during this exchange did counsel for defendant object based on misconduct, nor did he request any admonition.

11

During his closing argument, defense counsel referred to the matter as a "tragedy." Beginning her rebuttal closing argument, the prosecutor stated: "Interesting use of the word 'tragedy.' It's interesting and tragic to stand here and try to manipulate the evidence the way that [defendant] did. He did the right thing? There's some idea that he did the right thing at some point? He didn't do the right thing at any point. At any point."

Subsequently, the prosecutor returned to the tragedy theme: "The word 'tragedy' I kind of touched on a little bit, and I think one of the things that's most tragic is the defendant trying to steal his sympathy that belongs to the victim. He got up on the stand and when I was talking to him appears to cry for the first time in all of the proceedings. Not during the autopsy pictures, not during anybody's testimony but when he thought we were all looking it looked like he got upset trying to draw sympathy that shouldn't be his. [¶] The tragedy would be if somehow he was able to come in and convince you that things occurred that never occurred."

Defendant did not object in either instance. Nor did he request an admonition.

In all of these instances, defendant neither objected " 'in a timely fashion—and on the same ground,' " nor requested " 'that the jury be admonished to disregard the impropriety,' " as required to preserve his claims for our review. (*People v. Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 29.) Thus, although we do not condone some of the prosecutor's intemperate behavior during trial, defendant has forfeited his claims of misconduct.

Defendant notes that, even if his contentions have been forfeited, we have the discretion to consider them. While we do have the discretion to excuse forfeiture, such discretion is exercised sparingly. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Moreover, the forfeiture requirement serves an important purpose. Defendants must raise the specter of prosecutorial misconduct during trial, where the matter can be remedied in the moment in a far more efficient and effective manner than on appeal. (See *People v. Peoples* (2016) 62 Cal.4th 718, 801 [reason for the forfeiture rule is that the trial court

12

should be given the opportunity to correct misconduct of counsel and thus, if possible, prevent the harmful effect on the minds of the jurors].)  On this basis, we decline to address defendant's forfeited claims of prosecutorial misconduct.

## II

### *CALCRIM No. 626*

Defendant asserts that the trial court erred by refusing his request to instruct the jury with CALCRIM No. 626 on involuntary manslaughter based on unconsciousness caused by voluntary intoxication.  We disagree.

" ' "[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been committed*.'  [Citation.]" [Citations.]'  [Citation.]  . . .  ' "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ."  [Citation.]  Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense.  [Citation.]  " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " ' "  (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.)  A trial court's omission in failing to instruct on a lesser included offense is reviewed de novo (*People v. Nieves* (2021) 11 Cal.5th 404, 463), and we consider the evidence in the light most favorable to the defendant (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137).

Generally, involuntary manslaughter is treated as a lesser included offense to murder.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 422 (*Ochoa*).)  Evidence of voluntary intoxication warrants an instruction on involuntary manslaughter as a lesser included offense to a charged murder only when there is substantial evidence the defendant's intoxication rendered him unconscious.  " 'Voluntary intoxication can prevent formation of any specific intent requisite to the offense at issue, but it can never excuse homicide.'

13

[Citation.] Hence, in general at the time the defendant committed his crimes, voluntary intoxication could reduce a criminal homicide to involuntary manslaughter only if the defendant was rendered unconscious: 'When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1227, quoting *Ochoa*, *supra*, at p. 423, fn. omitted.) A person may be unconscious in this context when the person acts but is not conscious of acting. (*People v. Heard* (2003) 31 Cal.4th 946, 981; *Ochoa*, at p. 424; see also CALCRIM No. 3425 ["Someone is unconscious when he or she is not conscious of his or her actions"].) CALCRIM No. 626 would have instructed the jury on these principles.[4]

The evidence showed that, after K.C. kicked defendant out of the house, he returned, unwilling to leave without his backpack. He went into K.C.'s room and then he and N.W. "had words." At this time, defendant was holding a knife. Defendant told N.W. he had 30 seconds to leave, and then defendant began to count. He completed the countdown, at which point K.C. saw defendant swing his arm with the knife toward N.W. and, after defendant did so, there was blood everywhere. Defendant was throwing his arm like he was throwing a punch with his knife hand. When K.C. yelled for defendant to stop, he paused, looked at her, and then resumed. N.W. collapsed, holding his hands to his neck. Afterward, according to L.N., defendant "acted like he didn't know where he

---

[4]    CALCRIM No. 626 provides, in part: "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions. [¶] . . . [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. . . ."

was at because he was all high and we pointed him toward the back door and he took off."

In short, although there was evidence defendant drank alcohol and smoked methamphetamine, nothing in the evidence suggests, let alone constitutes substantial evidence, that defendant was intoxicated to the point of unconsciousness when he stabbed N.W.

In his testimony, defendant stated that he used methamphetamine every day for at least a week before these events, and he used it on the way to Dana and after his arrival. When he went to K.C.'s bedroom trying to recover his backpack, the confrontation with N.W. arose when N.W. blocked defendant in the hallway. Defendant testified he was scared so he took out his knife. He recalled N.W. looking mad. He also testified that he feared there may have been other people at the house. Defendant felt like he was being set up, like someone had purposefully taken his property and left him behind. Defendant also remembered feeling like he might be jumped, and he knew N.W. was a fighter. Consistent with the prosecution's evidence, defendant testified that he told N.W. he was going to count to 30, and when his countdown was finished, he was "going to rush him." Defendant counted to 30. According to defendant, N.W. then punched him in the head and defendant "blacked out." However, defendant also testified that he felt like he was in danger when N.W. punched him. Defendant continued: "I don't remember anything. Everything happened quick and I remember–all I remember is just [K.C.] screaming at me and I lifted my head up and opened my eyes and he was bleeding . . . ." Asked if he stabbed N.W., defendant testified, "I assumed that I did. Nobody else had the knife and he was bleeding." He testified he was sure he put the knife in N.W.'s neck. However, he also testified he did not recall stabbing N.W., and that he thought he had stabbed N.W. only once. Defendant remembered seeing blood squirting and seeing N.W. backing towards the front door holding his neck. Defendant characterized the stabbing as accidental because he did not plan on stabbing N.W., he "just panicked. I put my head

15

down and I think I just reacted" while holding a knife. Defendant testified: "When he punched me my mind went black because . . . when he swung at me I put my head down out of reaction and after I got hit . . . my memory just went black. I think it was the adrenaline."

We conclude that this does not constitute substantial evidence that defendant was unconscious as a result of voluntary intoxication when he stabbed N.W. Defendant remembered in detail virtually all the events leading up to, during, and after the confrontation. He remembered why he went back into the house and that N.W. supposedly prevented him from leaving. He remembered being scared there were other people, that he was going to get jumped, and that N.W. was a fighter. Defendant remembered who was present. He remembered pulling out his knife. He distinctly recalled his 30-second warning countdown, which could only be described as deliberate and methodical. In his Facebook exchange, defendant acknowledged he stabbed N.W., and rather than claiming he did not remember doing so, he claimed he "[d]idn't want to" stab N.W., but that "[h]e was in my face." Defendant told Detective Ashbee he remembered that "blood immediately started coming up" when he stabbed N.W. He remembered describing to law enforcement the blood coming out nonstop following his first strike. He remembered N.W. bleeding, backing away from him and toward the front door. Defendant recalled leaving the house, trying to call 911 but having no cellular service, and having difficulty finding his way to the road because he was unfamiliar with the area.

That defendant volunteered that, in the midst of the incident, all of which he remembered in detail, he "blacked out" at the moment he stabbed N.W. is not substantial evidence of voluntary intoxication leading to unconsciousness. A defendant's "professed inability to recall the event, without more, [i]s insufficient to warrant an unconsciousness instruction." (*People v. Rogers* (2006) 39 Cal.4th 826, 888; see also *People v. Heffington* (1973) 32 Cal.App.3d 1, 10 [there is no "ineluctable rule" that a defendant's inability to

16

remember supplies an evidentiary foundation for an unconsciousness instruction].) "The complicated and purposive nature of his conduct" both before and after the stabbing "makes clear that he did not lack awareness of his actions during the course of the offenses." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 418.)

The evidence could suggest that defendant blacked out briefly from being punched in the head. Defendant also opined that perhaps his memory went black because of adrenaline. However, in the absence of any evidence beyond defendant's claim, there is no evidence, let alone substantial evidence, to support the premise that defendant went from deliberate, conscious, methodical, and aware *despite his methamphetamine use*, to unconscious *because of that methamphetamine use* just long enough to not recall stabbing N.W., and back to conscious and aware as he saw N.W. bleeding and stumbling back in the hallway. In other words, substantial evidence does not support the premise that, for one discrete moment in an otherwise uninterrupted period of consciousness, defendant's methamphetamine use suddenly rendered him unconscious. All of the evidence is consistent with the conclusion that defendant was conscious, aware, and deliberate at all relevant times.

Defendant asserts that, unlike *Ochoa, supra*, 19 Cal.4th 353, on which the trial court relied, here there was conflicting evidence on unconsciousness for the jury to evaluate, and *Ochoa* does not apply where there is some evidence of unconsciousness. However, again, we do not find there to be substantial evidence of unconsciousness as a result of voluntary intoxication.

After considering the entire record in a light most favorable to defendant (*People v. Millbrook, supra*, 222 Cal.App.4th at p. 1137), we conclude there is no

17

substantial evidence defendant was unconscious when he stabbed N.W.  Accordingly, the trial court did not err in refusing to instruct the jury with CALCRIM No. 626.[5]

Lastly, we note defendant appears to raise a cumulative error argument, albeit not under a separate heading or subheading.  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  We have concluded defendant's prosecutorial misconduct contentions have been forfeited and that the trial court did not err in declining to instruct the jury with CALCRIM No. 626. Having found no cognizable error, there is no error to aggregate.  (*People v. McWhorter* (2009) 47 Cal.4th 318, 377 [having found no guilt phase errors, there is no cumulative effect of such errors to consider].)

## DISPOSITION

The judgment is affirmed.

\s\                          ,
Krause, J.

We concur:

\s\                          ,
Earl, P. J.

\s\                          ,
Boulware Eurie, J.

---

[5]      Defendant does not assert that the trial court erred in failing to instruct the jury with CALCRIM No. 580 on the lesser included offense of involuntary manslaughter generally.

18